I'll have to ask counsel to pronounce your name for me, please. Yes, good morning, Your Honor. My name is Christy Charpentier, and may it please the Court, I do represent Anthony Reed in this matter. Okay. This is my first opportunity to appear before the Court, and I would like to reserve two minutes for rebuttal. All right. Thank you. Your Honor, the record in this case is an outrage. It is a transcript which, quite frankly, shocked the conscience. When I first read it, when I was assigned to this case, it represents a... Speaking of the transcript... Yes, sir. It was rather frustrating that there's an awful lot cited in the briefs here that is not in the appendix. Now, it's true that we can get the transcripts sent to us. Yes, I had... Is there an explanation for that? Your Honor, I included with the appendix that had been filed at the time of the habeas the entirety of the summation with an expectation, and that was confirmed, that the entirety of the transcript would have been made available to the Court. If it's not, I can certainly take care of that. And I think, if I may continue, part of the frustration that the Court had with the citations and this transcript is that the pervasiveness of the activity, the misconduct by the prosecutor, began at the beginning of the trial and did not cease until the very end. Well, it's not just what happened in the trial. I mean, under Baldwin v. Reese, we're obligated, are we not, to make sure that at every stage, at each stage... Yes. ...of the state proceedings, the issues were presented to the state tribunals, right? Yes, Your Honor. And there's one piece of one brief from one of those stages. How are we supposed to know that what's being presented to us was presented at each stage of the state judicial process? Well, this was a case that was directly appealed after the trial to the Superior Court of Pennsylvania. The brief that was prepared on this claim, the same claim that's being presented to this Court today, was presented in five single-space-type pages, which, as I was responding to Judge Stapleton, tracked the misconduct nose-to-tail from the time of the opening remarks directly through the closing summation. There were 21 separate citations. There was an enormous piece of the closing summation that was included with citations, and the obvious and what was recognized at the direct appeal stage, as the claim made below, was one of donnelly pervasive misconduct that had to be assessed under a very well-established analytical framework. So it was... This brief is not in the appendix. Excuse me? You're not suggesting this brief is in the appendix. You're saying it's in the record. Yes, this brief is a part of the record in the case, yes, sir. How would we get that brief? Because I think we tried to get that brief. I have the brief with me here right now. It was filed in 1994. It was adjudicated by the Superior Court, and at that time there was aliquot or sought, aliquot or was denied, and when I was assigned to this case, the claim was plain. The claim was obvious. It had been exhausted in the state court below, and that's the claim that I'm here before you today. All right. So in continuing with what is going to be the task of this court, in looking at what has come to it properly exhausted, both factually and legally, I would point to the quantum of the misconduct that has been characterized in the same fashion, both at direct appeal and in federal court, and I think it's important to know that the areas of misconduct are what really lead to, I think, a mandate of relief that's required in this case. At the time of trial, the Commonwealth came to trial with a very evidentially challenged case. It was a statement case. There was a prior statement of a witness that the Commonwealth wanted the jury to believe. They knew that the witness was going to say that he had never made the statement at the time of trial, and what followed was an exploitation of very limited evidentiary rulings that were made in order to permit the Commonwealth to argue fairly, both other crimes, evidence, propensity, both gang affiliation and guilt by association, and also an invocation of the fifth in might, for example. Well, let me stop you there. Yes, sir. We have a case before us where, in about three and a half pages, there's, at least it's presented to us from the Superior Court brief, three and a half pages of argument about prosecutorial misconduct, and then what's presented in the district court is 70 pages. So, three and a half pages before the state court, 70-plus pages in the district court, and your opponent says, not in these words, but in effect, that tells you that they're telling you things that they didn't tell the state courts. They're presenting stuff for the first time here and complaining about things for the first time in federal court, and they're just flat out not allowed to do that. What's your response to the assertion that between three and a half and 70 pages, there's bound to be stuff that was not presented to the state court? I think it goes back to exactly what was raised on direct appeal, and what was raised on direct appeal was not like in the case of Wilson v. Vaughn, unlike even the case of Moore, which was decided through the circuit, and also in the cases from the Supreme Court of the United States, Donnelly and Darden, those were some bullet point cases. Those were very specific instances of misconduct cases, which were list available. This case is such an outlier that making a list was the same effort that I made that was made below. I looked at the direct appeal brief, and it was plain to me that it was the pervasiveness of the misconduct throughout each and every stage of the trial from speeches, and particularly in this case, and what makes it particularly egregious is through the presentation of the evidence with each and every witness that limited evidentiary rulings were exploited for wildly inflammatory and improper evidence to be put before the jury again and again. So the claim is the same. Let's get specific. When you say the claim is the same, the response specifically to the assertion that the Supreme Court of the State of reference to be made to the junior black mafia, and therefore it couldn't have been misconduct for reference to be made to the junior black mafia, and the Supreme Court of the State of the Commonwealth of Pennsylvania said it was okay to mention the other murder because there was a connection between the weapons in the two murders, so it couldn't have been misconduct to mention the other murder because there was a ruling that, although it was in a related case, it was a ruling that it was okay to talk about that. So those are two big chunks of your bad evidence argument. What's your response to their assertion that it can't be misconduct? The Supreme Court of Pennsylvania has already blessed it. The limited rulings that the trial court made were that the other crimes evidence, so that it wouldn't become propensity evidence, was that the fact of the other crime, not the facts of the other crime, were admissible. I'm not revisiting the rightness or wrongness of the state evidentiary court ruling. Same with gang affiliation. It was a limited purpose for which that evidence was going to be admitted, and that really was the evidence that had some foundational basis in the statement of the witness that they wanted the jury to believe. Again, I'm not arguing the rightness or wrongness of those state evidentiary rulings. The federal constitutional problem arose when each and every time there was an opportunity for the prosecutor to develop properly his evidence, he developed it improperly, and I use developed in a most gentle way. Developed in this case means blatant violation of court rulings. Over and over again, the judge is reprimanding him. Each and every time the improper, beyond the scope of the limited ruling evidence, is brought into court, objections are made. It's sustained. Something is said to the jury. Sometimes it happens at counsel table. Sometimes it happens at sidebar. Sometimes it happened loudly at sidebar. Oftentimes it had to be hustled into chambers. It was loud in chambers. And again, the improper evidence, above and beyond the fact of the evidence, came in, for example, in the other crimes propensity evidence, the fact of the identity of the gun and the presence of the defendant were fair game. What did the prosecutor elicit? That a little boy was shot in the back for throwing snowballs. That's what came out repeatedly. With regard to the gang affiliation evidence, what came out was that this was a violent drug gang that was also implicated in a series of other murders and that my client, Mr. Reed, was a hit man. That was beyond the scope. When we read the case.  Alitoson Let me ask a question about taking a step back. You say on page 1 of your reply brief, if I can quote it to you, the Superior Court of Pennsylvania adjudicated the due process claim based on prosecutorial misconduct on the merits. So you're acknowledging here that there was a merits-based decision by the State courts.  There's no part of Edper review. There was a merits decision. All right. And do you agree, if you disagree, is the state standard for deciding whether there's prosecutorial misconduct and a constitutional violation effectively the same, identical? I have asserted in my brief that unavoidable prejudice is a difference with a distinction. But even if it is the equivalent of the Donnelly standard of so infected the trial with misconduct that the trial was unfair, that no reasonable juror, jurist, who is faithfully and carefully applying the law could have found no violation in this case. I'm suggesting and asserting and arguing that the opinion of the trial court that was adopted by the appellate courts was unreasonable. It was an unreasonable application of the well-established law at the time. And that's the trial judge who sat through these raucous proceedings that you've described, right? He did more than sat through. In some ways he contributed to the confusion and the misleading of the jury by the way that he conducted the trial. All right. But it is that judge, yes, sir. So, okay. So be very precise with us if you can. If I understood your argument right, it's not that the magistrate judge whose R&R, whose report recommendation was adopted by the district court was necessarily wrong in each of the five categories that the magistrate judge broke down the alleged misconduct into. It's that the magistrate judge failed to account for the cumulative effect of all this. Is that correct? Yes, sir. She, just like the trial court, did not do the proper analysis. For whatever reason, I know the trial judge revisited his evidentiary rulings, engaged a little bit of revisionist history. Certain of his conclusions that he states with authority in his opinion are absolutely contradicted by the record. The district court magistrate engaged in a similar deconstruction and entirely missed the claim. So at this juncture, this court has an opportunity to do what is correct, to apply the proper analysis and see that this was an unreasonable application of law and relief is required. And the claim is, just so that I'm clear on it, that it's not any particular thing. It's the whole ball of wax. You've got to look at the whole thing in total, the cumulative effect, and if you look at the whole thing in its completeness, then you see that it's manifestly an unreasonable application of federal law to say this was not so severe as to be called a constitutional violation warranting a new trial. I'm out of time. May I respond? I wish you would. Yes. The cumulative analysis has yet to be done, and it must be, and as I said, relief would be required. I think in conjunction with the outrageousness and, quite frankly, shocking nature of this transcript and the idea that that would be given the imprimatur of a fair trial is also a bit of a shock. But more importantly, Judge Jordan, the areas in which the prosecutor exploited the limited rulings were what make this almost worse than Darden, and unlike Darden, do require relief, because it was during the very development of the evidence. For limited rulings where the inflammatory evidence was repeated over and over and over again, the jury was awash in clanging bells. There was just no way for this judge to undo the harm that had been done by the misconduct. So it's the whole, and it's highlighted by the areas of misconduct that were a campaign to compensate for a very challenged evidentiary case. This was a two-day trial at most, a statement case that took nine days to try. And I would ask this Court to grant relief, and I will revisit you with rebuttal unless there are further questions at this point. Thank you. Thank you. Mr. Goldberg. Good morning, Your Honors. My name is Joshua Goldberg, and I represent the Commonwealth's official nominal party respondents, the FLEs. I'd like to note that the prosecutor's oral misconduct claim that was presented at the Superior Court was attached as Exhibit I to my response to the habeas petition in the District Court and should be available on ECF. But the prosecutor's oral misconduct claim in the Superior Court was attached as an exhibit to my brief. I'd also like to add that my friend has argued that the record of this case shocks the conscience. This record was reviewed by two sets of magistrate judges and two district judges in the District Court, one in connection with this case and the other in connection with the co-defendant's case, the co-defendant raising at least partially overlapping claim of prosecutor oral misconduct. And the record certainly didn't shock any of those judges' consciences, at least with respect to the Junior Black Mafia evidence. In the related case, you know, you also have the magistrate judge and the R&R approved by the district judge saying, you know, I'm not seeing this pattern that you're alleging, you know, of trying to disregard the judges. You're not suggesting, are you, that this was a model of decorum in this case? I mean, the transcript does show a whole lot of back and forth between the trial judge and the prosecutor and assertions that the prosecutor was stepping out of line. Wouldn't you agree? Judge Jordan, I'll be the first one to say that I don't think, in a sense, the prosecutor is really doing his or her job right unless they're doing not just what the law and rules require, but fully upholding the highest and best traditions of the office. That having been said, I think it also is important to note that, as the Supreme Court noted in United States v. Young, and as Judge Hand said before that, criminal trials are not scripted events. It's not reasonable to expect that they'll be tried without a motion. And it's also important not to lose sight, I think, of what kind of case this was. I mean, this wasn't the kind of case where you have, you know, the attempted assassination of a prospective witness and you have a trial where, to put it charitably, you have both prosecutor and judge, you have more than the usual concerns about the prospect of witness intimidation, you know, and tampering in the courtroom. And you also have defense counsel pursuing what I would describe as the best defense is a good offense strategy of trying to needle and go the prosecutor at every turn. With some success, evidently. With some success, regrettably, Judge Jordan. All right. Well, let me ask you something pretty specific. You said on pages 32 and 33 of your brief that there's no material difference between the Pennsylvania formulation and the Supreme Court of the United States formulation of the legal standard associated with whether prosecutorial misconduct amounts to due process violation. Am I right? That's correct, Judge Jordan. I believe that this court also said the same thing in the Fahy case, which is at 516 F3rd 169. I believe it's footnote 34 in the accompanying text. Okay. And, in fact, why don't you give that to me one more time? It's 516 F3rd 169, and I think I'm thinking of footnote 34 in the accompanying text. Okay. But in my brief, I cited the cases that deal explicitly with the contention that the unavoidable prejudice language is inconsistent with Supreme Court precedent. Okay. Now, let's say we say that's right. These are really different words, but they mean exactly the same thing. How is it, if that's true, that you can take the position that there was not a ruling on the merits here? I mean, you're at some pains and go on at some length in your brief about maybe this is procedurally defaulted, they really didn't present this. If it's the same standard and it's unarguable that they presented the state cases and argued it and the court ruled on it, didn't they, in fact, exhaust completely and get a ruling on the merits? A complicated question, and I believe that's the one that I believe the Supreme Court reserved in Baldwin v. Reese about what happens if you raise what may be a state law claim, but it's decided by the state courts under a standard that's indistinguishable from the federal standard. You know, I think that that's an issue on which the Supreme Court hasn't ruled. And I think that's a matter of logic. If it's exactly the same standard and you're the one who's taking the position that it's exactly the same standard and they ruled on the merits on that standard, if A equals B and they rule under A, then they've necessarily ruled under B, haven't they? I think that as the Supreme Court held it, if you want to allege that you've been denied due process under the United States Constitution, it's not so difficult to say so in your brief and that's the clearest way to do it. But, Mr. Goldworth, that doesn't answer my question. My question is you have contended they procedurally defaulted, but at the same time you're contending that the standard is exactly the same. I understand there's an institutional interest for you to make both those arguments. Yes. I'm trying to understand how they can be made consistently. If those are the exact same standards and they ruled under the state standard, did they not, per force, by just plain old logic, wasn't there, in fact, a ruling on the merits on the federal claim and, therefore, properly the claim is before us? There was plainly a ruling on the claim as to whether what was presented to the state courts is deemed to be sufficient to be deemed the exhaustion of any federal claim. That, I think, is the question that I think the Supreme Court has reserved and that I don't think. I think it's the sort of thing where if the court were to assume, as the statute permits, if the court were to assume without the need to decide under subsection B2 of the statute that any federal claim was presented, at least to the extent it was presented to the state courts, I think that's legitimate. Then I think the Petitioner would be hard-pressed to claim that there wasn't a merits adjudication, which, of course, they've conceded. But I don't think for the purpose. My problem is you don't seem to have conceded there was a merits adjudication. You seem to have said there isn't a merits adjudication. And I don't think I can square that circle. I just, and maybe I'm not going to get any more on you from this point than I've gotten so far, but it seems to me that by your own argument that these are identical standards, you are conceding that there was a ruling on the I am conceding. I don't think I'm conceding that, Judge Jordan. I think that it's actually a difficult and complicated question about whether raising a state court, just at least in the abstract, I think in the context of this case, one could certainly understand, as the statute permits, assuming without the need to decide that a federal claim was presented, at least to the extent it was state courts and then go from there, as the statute I think permits to avoid sometimes some of the more complicated questions of exhaustion fair presentation when they're not necessary to the judgment, as I don't think it is here. Okay. Help me. I was shocked when I read this transcript. But I was shocked by the lack of respect, indeed the contempt shown by the prosecutor to the court. But I don't understand that to be what we need to focus on today. I think we need to focus on today the impact on the jury under the applicable standard, and I think you agree with that. Yes, Judge Stable. And we have to do it in the context of the whole case and the strength of the evidence and the limiting instructions given by the court, et cetera, et cetera. Yes. And I think we need to focus on what this misconduct resulted in the jury hearing over and above what they would have heard anyway if there had been no misconduct. And, of course, the state court relied on that quite heavily in saying this evidence, in several instances they said this evidence is admissible because it's probative of issues that were actually being litigated. And the jury was going to hear about the junior black mafia because that evidence was essential to the government's case on motive, on intent to kill, and on conspiracy. Yes, Your Honor. And I understand that and I find that persuasive. What I really have trouble with is I understand that the state court held that the Waters murder evidence and Mr. McKee's, I guess it is, testimony was relevant and it was probative of his access, Reid's access to the murder weapon. And I can go with that. But the district court, I mean the trial court, made it absolutely clear that, which is obvious, that there was no need for the jury to know that a 16-year-old boy had been shot for throwing snowballs at the car that Reid was in. And it's hard for me to think of some, if the standard is whether this had an effect on the jury, that made it unable to fairly evaluate the evidence against Mr. Reid. It's hard for me to see anything that I think could be more calculated to adversely affect his interest and to horrify the jury. Now, having said that, what is your response to that? I mean, can we really overlook that? Well, I think in this case also, I mean, you have, of course, the state court trial judge who actually heard the evidence, obviously thought that it didn't have that effect on the jury. He realized it was going to have a negative impact because he ruled it out and he told the guy to stop and he wouldn't stop. But he said my limiting instructions were good enough. But if we look at it, can you really say, can we safely say that the limiting instructions were sufficient to give this man a fair trial when they were told that he shot a 16-year-old for throwing snowballs at his car? I mean, I think they were. And I also think that, as the state court made clear and as I think was also obvious, I know in the district court, although not here, there was a claim the counsel was ineffective for not challenging more aggressively Mr. McKay's identification of the petitioner. I mean, I recognize the position that this puts somebody like the petitioner in at trial. On the other hand, there also seems considerable unfairness in arguing that, well, the prosecution's case was weak because it depended so much on this identification, but then argue about the details of what this witness observed were not just unduly prejudicial but a violation of the Constitution. It also, I think, bears mention that this wasn't the only eyewitness to the shooting. And I think it was also unfair to say that our case was weak because the only witness that the jury heard at this trial about the other shooting connecting him to the gun was this one witness. I don't, you know, I mean, I think that also has to be part of it. What's the downside for a prosecutor? And other than, you know, we would hope that every prosecutor has a sense of responsibility and integrity about following the rules, but what's the practical limits on a prosecutor if a prosecutor can do the sorts of things that were done here and a conviction stands? You know, where a trial judge repeatedly says, you can go this far, no farther, and the prosecutor runs up and keeps going over the line, and then there's arguing back and forth and fighting. And you can say that the defense counsel needled him into it, but for whatever reason, I mean, I think you'd have to concede that over and over again in this case, the prosecutor is going up to where the trial judge said, and no further, and stepping over the line. Isn't that just the fact of the case? I mean, in the transcript replete with that? It is, Judge Jordan. So what's the practical, how institutionally, what's the pushback on a prosecutor thumbing his or her nose at the court if the goal that the prosecutor wants, namely conviction, can't be taken back when there are repeated violations? The pushback, I think, is a sanctions against the prosecutor directly. Would that happen here? But that, especially when the claim is one of constitutional due process, that we don't, in effect, punish society by needlessly requiring the retrial of people who weren't harmed by the errors they're complaining of. Now, there's a key point in your assertion, needlessly. That, of course, is the real problem, right, is we've got to figure out what Judge Stapleton just said, which is whether you can say the things that this prosecutor said and still have a jury untainted, right? Is that the nub of it? Well, and, of course, under the state interview that applies here, whether the state court's determination was so unreasonable as to be beyond the ability of fair-minded jurists to agree, and I think the answer to that question is it clearly wasn't. And, again, I hasten to add that, again, you have had not just this set of – not just this magistrate judge and this district judge, but at least in part you've had another magistrate judge and another district judge of this court review the same record. Thank you very much, Your Honor. Thank you very much, Mr. Goldberg. Ms. Sharpen here. Thank you. May I proceed? Please. I'll begin where my colleague, Mr. Goldberg, began as well, which is the co-defendant case in this case. There are tremendous distinctions between the claim that was reviewed of Mr. Bowman versus that, the claim which is before this Court on behalf of Mr. Reed. Mr. Bowman's was of that specific instance variety. The other crime's propensity evidence was not a part of that claim. It was reviewed thusly and no relief was granted. It's not the same claim. Secondly, Judge Jordan, you identified on the heels of what Judge Stapleton had said about a whole lot of back and forth in this trial and what it was like. My colleague suggested that the judge had alternatives in order to have pushback for the prosecutor, and he threatened each and every one of them repeatedly. Fines, bigger fines. You're going to pay for the cost of this trial. I'm going to write to your superiors. You're going to pay my salary over and over again. And when we talk about the effect of the jury, that's where the rubber hits the road. What is then the jury left to consider? This man wants to tell me everything. Those people want to hide it all from me. The judge says he's going to limit him, but he doesn't. I guess we should think of it all. Well, what about this view, that it all inures to the defendant's benefit because the jury listens to all this, realizes the prosecutor's whatever word you want to use for it, and says we're going to hold it against the prosecutor? Well, I think the answer to that, sir, is that how can it? When the nature of the misconduct around the evidentiary issues that were so important, guilt by association and propensity, are so inflammatory. That may be the answer for misconduct when he is uncivil at the bar of the court, but that can't be the answer when the nature of the impropriety, the improper evidence, is, as Judge Stapleson remarked, a 16-year-old boy shot in the back and that this was a killer gang with, quote, a series of other murders on its belt. That's the kind of evidence, having been many, many years in the trial rooms, that cannot be undone, especially in this case when it's done over and over and over again without consequence. So that would be my response to that. The defense had to respond in some way, but because the trial became a trial, win of the trial, they were really tilting with windmills. We're looking at all of this evidence. You just mentioned the two, what I presume you believe to be the most egregious. Are there any others that you would put into that sort of most egregious category? Yes. I think the blatant violation of the clearest rule that this judge made was, you will not, Mr. Prosecutor, comment on the invocation of this witness's Fifth Amendment rights in a prior proceeding. Page one of the opening statement, that witness took the Fifth Amendment. That's the level that this prosecutor was willing to deal in in order to compensate for what he must have realized, I don't know, was an evidentially challenged case, was a statement case with appropriate rulings, could have been tried fairly. I've done it. That was not what was done here. This was a campaign that began as soon as the prosecutor had a chance to address the people and did not stop until he was finished. If you look at the summations, they're not just a summation of the prosecutor's evidence. It's a road map for this court to see how he improperly argued all of the admissible evidence. It's an incredible catalog, which is why appellate counsel and me, when I presented this on habeas at the first instance, used the entirety of the summation as a way of spotlighting this very outlier case. This is the most basic tenant complaint that a defendant may have, I didn't have a fair trial. These are the most egregious set of facts I have ever seen. All right. Thank you very much. Thank you very much, Mr. Armitage. Appreciate it. Appreciate the arguments from both sides. We'll take the matter under advisement and we'll recess court.